Last case for argument bill number 071118 Venture Industries v. Autoliv District Court, my name is Peter Green and I represent Autoliv, the appellate here. This is an appeal from a decision of the District Court on remand. The basic question is whether there is a legal standard in Applying Rule 60b-3. The lower court was instructed on remand to determine whether reliance on Venture's financial information by Venture's expert constituted fraud or misrepresentation. And our position is the court applied the incorrect legal standard to determine whether a fraud or misconduct occurred here. If material and information is submitted to the jury that is tainted by fraud, the Rule 60b-3 misconduct analysis is satisfied. Has any court ever held that Venture's accounting irregularities constituted fraud? No, Your Honor. No courts have ever held that. The standard that is required under Jordan in the Sixth Circuit to show that is clear and convincing evidence that fraud has occurred. The fraud that occurred here was accounting fraud, financial fraud. And the evidence that establishes that, which we submit satisfies the clear and convincing standard, is Venture issued an 8k that publicly reported its financials as far back as 1998 were no longer reliable and it publicly reported its 2002-2003 financials for its Grand Blanc plan, which is the relevant plan. Did it restate the financials? It did not restate the financials, Your Honor. Venture went into bankruptcy and there have been no restated financials since this time publicly. However, at the district court on the Rule 60 evidentiary hearing, an affidavit was submitted by a Mr. McHugh, who is Venture's current controller, and he testified in that affidavit that Venture did restate the Grand Blanc internal financials to reflect the recommendations of the forensic accounting firm. Those were not audited restatements, but they are the restated internal financials for the years 2002 and 2003. Inadequate internal controls that can lead to the need to say, please don't rely on my financial statements, and or maybe lead to restatement if somebody doesn't go on bankruptcy, is hardly evidence of actual fraud. I mean, the people that represent your corporate department would be horrified to hear you say that. Your Honor, these were more than inadequate financial controls. They were misstatements of inventory. They were misstatements of... They were misstatements of payables. The forensic accounting report, the March 25, Doren Mayhew report, termed these accounting irregularities. Irregularities is a term of art in accounting, and that means fraud. And those are the corrections that Mr. McHugh was making in the restated internal financials of Venco, which is the Grand Blanc block. But there has been no determination that those things were fraud. No, Your Honor, there's been no determination by a core or any determinative body, but there has been a public statement issued under the securities laws by Venco announcing these accounting irregularities. That's an S.A.K. And the company itself now, according to Mr. McHugh, has restated its internal financials at Venco to correct the inventory accounts, to correct the payables accounts. And the standard of proof for clear and convincing evidence is not that there'd be some holding by a court, we would submit, Your Honor. It's just that it'd be highly probable. We submit the fact that you have a forensic accounting report finding accounting irregularities. An 8K report... Right, but is there any evidence here that the irregularities were due to misconduct as opposed to inadvertence or accident? Yes. Yes, Your Honor, there is some evidence that the March 25th Doran Mayhew report indicates in the report that it believes the accounting irregularities were caused by one entity at a time for the purposes of managing profits. What the district court did, we submit, was to require auto leave, place a burden on auto leave, showing that the facts concerning these accounting misstatements and this fraud had an outcome determinative effect on the case or would have essentially implied a 60-D2 analysis. And your view is that you don't have to, assuming there was fraud in the period in which you suggest it occurred, your view is that there doesn't have to be any nexus between that and the Levko testimony? No, Your Honor, that's not what I'm saying. Well, the judge made quite a number of findings with respect to the absence of any nexus between what Mr. Levko said and any allegations with respect to fraud. Are you suggesting that we have to reevaluate those under, you know... Your Honor, I think the findings the judge made is that the fraud that was identified did not, would not change Mr. Levko's conclusion and would not change his calculations. We believe and submit that's the wrong standard, that's not what the Frege court holds, that's not what was held in Schwager Foods. The key here... Well, no, I mean, I read it a little differently. I mean, I think what the district court concluded was that the accounting irregularities in the 2004 report didn't affect the financial statements in 96 and 2001, the ones which Mr. Levko was relying on, right? No, Your Honor, the judge did say that's not what Mr. Levko was relying on. Mr. Levko... So you're saying that the district court made erroneous factual findings? If you read the district court's opinion, it's stating only that Mr. Levko relied on facts up to 2001, and I don't read it that way, Your Honor, then he did make an erroneous conclusion. Because when Mr. Levko testified, and I just want to quote the testimony, he was asked, this is at the trial, he was asked, and when you talk about plant-wide actual experience, what sort of data or information were you analyzing to arrive at total plant-wide variable burden? Answer, I had income statements from the facility year by year. I took a look at all those income statements over the period that at issue here, 1996 through 2003, and was able to identify what labor, the variable burden, and fixed burden was. Now, the evidence is indisputable in this record that the financial statements of EMCO from 2002 and 2003 were taken by fraud. The AK tells us that, the March 25th dorm Mayhew report tells us that, and Mr. McHugh, the EMCO controller, he tells us that in the affidavit. And when Mr. Levko was examined on cross-examination at the evidentiary hearing, he admitted when he saw the restated April, May, and June 2003 internal VEMCO statements, that the cost of sales in those restated statements was higher than the cost of sales in the internal plant statements he relied on. What was precisely the nature of the remand order? I think that's been a subject of some debate, hasn't it? Yes, yes it has. And I'm reading, it's part of the opinion where we said on remand, the district court must decide, isn't that where we're going to find that? I'm reading from Judge Cohen's opinion, but I can probably find it in our own decision. District court must decide whether or not it has established that reliance upon venture's financial information by venture's damage expert, that's Mr. Levko, constituted fraud or misrepresentation. That's correct. Now the way venture has construed that... Let me just say, what I understood Judge Avery Cohen to say is, that's the question for me. If I find that there was fraud or misrepresentation, I go to step two and I got to decide whether it had any effect on litigation. But as I understood Judge Cohen, he stopped at step one. He said, I've listened to this witness and the witness tells me that information didn't have any effect on what he said and consequently it can't constitute fraud. Isn't that what the judge said? That's essentially what Judge Cohen said, but in reaching that conclusion, Judge Cohen reached that conclusion based on the view that he concluded, based on what he heard from Mr. Levko, that the fraud would not change Mr. He ignored entirely the fact that Mr. Levko relied on fraudulent information and referred to that fraudulent information in his testimony to the jury. Mr. Levko admits on examination at the evidentiary hearing that he could not testify today as he had at the trial. So in Mr. Levko himself committed fraud in his testimony as opposed to whether his reliance on information put fraud into the trial and thereby tainted the trial. Well, he was not aware that there were any of these improprieties, shall we say, in those financial statements at the Mr. Levko knew at the time he was testifying that there were these improprieties or the counsel and that we've never taken the position that they knew at the time they did it. But clearly, Venture knew. It was a Venture employee that committed the fraud and Venture is obviously responsible for its employees. And the fraud, according to the rule, is not the fraud of counsel or of an expert witness. It's fraud of an adverse party. And Venture is the adverse party that committed the accounting fraud that infected this trial. And it was related to the jury and relied on by Venture. Mr. Levko testified that he got reliability and took great confidence in the fact that Venture's financials were audited statements. He admits he could never say that now. The context of that in this trial shows it was very material. But you keep referring to these statements as being fraudulent when, as we've discussed earlier, there hasn't been no determination yet by any court that there was fraud committed. Your Honor, it's absolutely correct. There hasn't been determination that there was fraud So you have testimony here from Mr. Levko that it's uncontroverted that he was not aware of the discrepancies at the time. He relied on these statements, which later turned out to be incorrect. And he said that he relied on these statements. And I believe there's some testimony that it wouldn't have made a difference to him as to the outcome of the Mr. Levko testified, he would not change his conclusions and it wouldn't change his opinion. But, Your Honor, the question here is the fraud doesn't have to be determined ahead of time by some court. Mr. Levko doesn't have to Your Honor, just stop for a second with what I understood to be your agreement with the presiding judge that Mr. Levko testified that even if he'd seen the numbers that he should have seen instead of the ones, it wouldn't have affected his decision. It would not have changed his opinion. Then isn't that game over for you? No, it's not. Because the question is not whether it would have affected Mr. Levko's opinions, how would it have affected the jury? Because the jury might not have relied on his statements as they did if they knew the data he was relying on was not as reliable as he told them and when he told them he believed it to be because it was infected by fraud. The context that this information was used, I think, is very important, Your Honor. Mr. Levko testified as to a damage model that relied on relatively day-to-day routine documents in large part, bid sheets and the like. AutoLeaf had a financial expert that presented the data, a damage model, that relied on audited financial statements. Now, faced with the AutoLeaf's reliance on audited financial statements, Mr. Levko, Venture sponsored evidence from Mr. Levko that he also relied on audited financial statements, thereby enhancing the credibility of his model. And again, when they argued to the jury, they emphasized this point. They said, what did Mr. Levko rely on? The same audited financial statements. He did a lot more and it all went back to the audited financial statements. So they used this statement, that there were audited financial statements that were reliable, that Mr. Levko admits he could not say now to enhance the credibility of his opinion. And I believe that's a material way that the fraud is infected this fraud. All right. Mr. Green, we'll give you back your two minutes of rebuttal and let's hear from your adversary. Good afternoon. Good afternoon. John Ending on behalf of Venture. And I'd like to start with a point that was the subject of a question that I proposed to the council. Has there been any finding of fraud? No. In fact, the word fraud is not used in any of the independent data that was generated in connection with the analysis of Venture's books, except by Auditor in its brief, used at 70 times by our panel. The fact of the matter is that the Dorn-Mahieu reports, which were the subject and are the subject of this appeal, were generated post-trial, use terms like potential irregularity, potential accounting irregularity, preliminary investigation, not a detailed review. In fact, the March 25th report of Dorn-Mahieu was completed in a little over a two-week period. We are not talking about fraud here. In the district court conclusion, not only are we not talking about fraud, not only was Mr. Leverett's testimony in fact... What about the statement that your adversary referred to that said somebody later on came after the fact and said they were monkeying with the earnings, which is fiddling with inventory and, you know, especially if they were accrual accounting, that's a classic way to jack up your month or quarter ends. Yeah, and I put a little tab in my appendix, page 904, to make a point that specifically puts that into some perspective. The actual language that was used, the only motive identified was that Mr. Avestis tried to manage earnings based on an accounting system that he circumvented and controlled. Purely it appears that Mr. Avestis' motive may have been job security and a high ego to accomplish what he believes was a correct system. However, that particular excerpt, which is at page 905, deals with the manipulation of payables. The district court made the specific finding the payable issue did not arise until July of 2003, outside the period that was the subject matter of the trial. It's an issue that wasn't even the subject of trial. The accounting records for July of 2003 weren't even in evidence as evidenced by a trial exhibit. What you're telling me is that the only possible evidence of motive to turn what could have been accidental or inadvertent accounting errors into evil accounting errors was post the period of time that they changed it all? That's what the district court found. And to give Mr. Avestis his due, the Dora Mehta report, and I will say that they were even handed in this regard, they asked Mr. Avestis about the inventory issue, which potentially is within the trial period. And what was Mr. Avestis' response? He didn't agree with the results of the fiscal inventory. Now, there is a fraudulent motive. That's routine corporate practice. And in fact, in that year, in that period of 2002, where he determined not to make the inventory adjustment that Dora Mehta was suggesting should be made, he'd already made one for $6.8 million. He'd already made an adjustment of $6.8 million. This is not the stuff that fraud is made of. And I'd like to get back to a point that was made by Judge Prost in connection with the nexus issue. I brought a chart, so I think I have to use it. Don't feel compelled. Mr. Lefkoe did an analysis of the damages associated with producing airbag covers. This is raw data, not financial information. He used studies specific to airbag covers because he said the plant-wide financials, which are the subject of the Dora Mehta reports, are simply too unreliable. Why? Because in the same plant, they also make these. These are bumpers. You can see the disproportionate amount of material that goes into a bumper versus an airbag cover. 66% of the product in the plant was bumpers. 33% was airbags. Mr. Lefkoe said, well, I can't look at total production costs of a plant that has this mix of product. I need to look at the raw data specific to airbags. And that's exactly what the district court found in its original opinion and in its most recent opinion, that the information was specific and reliable as it related to airbag covers. What you're looking at here on this chart is what Dora Mehta is talking about. That is, the whole wall lacks. Dora Mehta says, well, there's some issues about the total amount of inventory and the amount of write-downs. It is completely disconnected from what Mr. Lefkoe did at trial, and that's precisely what the district court found here. The district court found Mr. Lefkoe's testimony, and I think it's appropriate to quote it. It was based on information that Dora Mehta's report relates to 2003. There's no evidence to suggest the accounting irregularities described in the Dora Mehta report affected the 1996 to 2001 financial statements. Again, his analysis was limited to 2001. Dora Mehta relates to 2003. The adjustments called for in the plant-wide financial statements would not have resulted in any significant change in the contribution margin. And his point is simply this. Even if you take the Dora Mehta report's analysis and you accept it as true that these, quote, potential irregularities in fact were irregularities and they needed to be added back in, even if you did that, it doesn't change Mr. Lefkoe's testimony. And I don't mean that Mr. Lefkoe says it doesn't change it. The math doesn't change. Mr. Lefkoe used plant-wide financials for two purposes. One to test scrap rate and one to test fixed and variable rate. With respect to fixed and variable ratio for burden, the district court found and this court affirmed his finding, his factual finding, that the fixed and variable burden rate would not change, no matter what the Dora Mehta report said. Wouldn't change. So his testimony is true and accurate and was a trial. Now let's get to the scrap rate. Mr. Lefkoe testified 15% scrap rate. The Dora Mehta report says we ought to make a change. Well you make the change. It changes the scrap rate plant-wide to 13%. He used a more conservative scrap rate of 15%. His testimony at trial was true and accurate. There's no fraud here. He relied on data specific to airbag covers and what he did when he did test with respect to plant-wide financial information, the only two tests he conducted would not have been affected and were not subject to the Dora Mehta report. That's what the district court found, that's what this court affirmed, and now we're back here again with the court saying the same thing. There was no fraud. I'm sorry to say that I don't think I've ever had an appellate argument where I've never, I've not used all my time. But the issues here are so straightforward and so simple and the district court's analysis I think is so compelling that unless you have any other questions, I'm done. All right, thank you very much. There's never a penalty for yielding back time. Thank you and we'll hear from Mr. Green on rebuttal. You have two minutes. Thank you, thank you very much, Your Honor. First off, Your Honor, I'd like to point out that page 905 of the appendix, which is the May 25th Dora Mehta report, it makes it, which is the part that counsel is referring to with regard to distress letters, it makes it very clear that they are not talking about July and after. The first two lines of the report say, based on preliminary investigation as conducted above, it's argued that much of the accounting irregularities, much of the accounting irregularities as identified at the Grand Blanc facility occurred between May 2003 and December 2003. The testimony I read to you before, quoted before, shows that May and June were clearly relevant. Secondly, with respect to inventory, counsel has argued that the statement on page 205 relates only to payables. If the court would refer to page 902 of the appendix, I'll quote the last paragraph. It says, as a result, Grand Blanc had overstated its inventory on its financial records as of December 31, 2002 and 2003 by $2.8 million and $2.5 million were not adjusted to coincide with the physical inventory accounts. However, it is our view that Mr. Resnakis, who had control over the actual physical count of inventory and the adjustments to the accounting records, utilized this as a mechanism to possibly control profits. So we link to inventory as well as payables. What the court did below that we submit was it attempted to calibrate and measure the effect that fraud that permeated this trial or misconduct that permeated this trial had on the jury. Once you have misbehavior of the type governed by Rule 60, the court should not try to calibrate it. Then under Jordan... You're confident that if you had another trial on damages, Judge Cohen would allow you to tell the jury to describe these accounting irregularities as fraudulent? You're pretty confident of that? I'm confident he would allow me to question Mr. Levko as to whether he can say with confidence that the statements are accurate any longer. And I'm confident he would allow me to call Mr. McHugh to the scene and have him testify as to the corrections that he has made into the internal accounting records. What happens if Mr. Levko says the accounting statements don't make any difference to me because the accounting statements dealt with a hodgepodge of inputs and I only care about one? Well, if he says that, then I will be able to question him and try to impeach that and the jury will be able to decide whether it believes him in light of what he relied on or whether it doesn't believe him. That's what we didn't have the opportunity to do, Judge, to get before the jury the fact that the things Mr. Levko relied on... Well, wait. If you have a retrial, then isn't everything fresh? Unless you're asking for a new trial. A new trial, Mr. Levko can come in and say,  It will be fresh. I would anticipate Mr. Levko is going to have a very different analysis in a retrial. But if you put on the same type of evidence, I could go after that evidence. I don't think we'll ever hear about the audited statements in the new trial if one is directed. All right, Mr. Green, I thank you very much. I thank both counsel. The case is submitted.